UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,<br><br>          Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| MOHSIN Y. MEGHJI, Litigation Administrator, as Representative for the Post-Effective Date Debtors,<br><br>          Plaintiff,<br><br>          -against-<br><br>COMPOUND LABS, INC., COMPOUND DAO, ROBERT LESHNER, and GEOFFREY HAYES,<br><br>          Defendants. | Adversary Proceeding<br><br>Adv. Proc. No. 24-03989 (MG)<br><br>Civil No. 1:25-cv-00926 (JLR)<br><br>__OPINION AND ORDER__ |

JENNIFER L. ROCHON, United States District Judge:

In this adversary proceeding, Celsius Network LLC ("Celsius"), through its litigation administrator Mohsin Y. Meghji ("Meghji"), seeks to hold the defendants liable for the loss of assets it posted as collateral on a software protocol the defendants allegedly controlled. Before the Court is the defendants' motion to dismiss Meghji's complaint. For the following reasons, the Court GRANTS in part and DENIES in part that motion.

## BACKGROUND

### I.  Relevant Facts

The following facts are taken from the First Amended Complaint ("FAC"), *see* Dkt. 27, and presumed true for purposes of this motion.

Defendant Compound Labs, Inc. ("Compound") is a technology company whose "purported purpose [is to] establish[] properly functioning money markets for blockchain assets." FAC ¶ 25. Defendants Robert Leshner ("Leshner") and Geoffrey Hayes ("Hayes") (together, the

"Individual Defendants," and together with Compound, the "Moving Defendants") are its co-founders. *Id.*

### A. The Borrowing Process

One of Compound's products is the Compound Protocol (the "Protocol"), *id.*, which is "a peer-to-peer borrowing system" for blockchain assets, *id.* ¶ 27; *see id.* ¶ 25-26.  The Protocol creates a "community pool" — or "liquidity pool[]," *id.* ¶ 30 — into which users deposit their assets and out of which other users borrow those same assets. *Id.* ¶ 29.  Users cannot negotiate the interest rate of the loans they take from, or make to, each other: "rather[,] it is set automatically by certain features of the [P]rotocol," *id.* ¶ 35, "based on the supply and demand for the token" on loan. *Id.* ¶ 28.  As a result, "[e]ach money market is unique" to each crypto token that users can deposit and borrow. *Id.* ¶ 28.

The Protocol requires not only that users post sufficient collateral before borrowing or lending, but also that users maintain a particular "collateral ratio" throughout the term of their loan. *Id.* ¶ 36.  The FAC does not allege the exact collateral ratio that was required at any point during the relevant period; in short, however, a user's posted collateral must be worth more than the assets the user has borrowed, *id.* ¶¶ 36-37, and "who[]ever controls" the Protocol determines just how much more valuable the collateral must be. *Id.* ¶ 29.  If at any time a user fails to maintain the required collateral ratio — including because either the value of the collateral falls or the value of the borrowed assets rises — the Protocol automatically "causes the user's borrowing position to be liquidated." *Id.* ¶ 2.  Specifically, the Protocol offers the user's collateral to all other users on the Protocol, who can purchase it "at the current market price minus a *liquidation discount*." *Id.* ¶ 37.

To monitor users' collateral ratio, the Protocol tracks pricing data for both collateral assets and borrowed assets to determine their value. *Id.* ¶ 40-41.  In a whitepaper written by the

Individual Defendants and published by Compound in February 2019 (the "Whitepaper"), *id.* ¶ 32, Compound stated that this valuation process "pools prices from the top 10 exchanges," *id.* ¶ 41. Thus, "[p]otential investors" were "led to believe ten sources of information would be used to value the collateral they maintained on the [Protocol]," which would ensure accurate valuation and guard against "wrongful liquidation." *Id.* ¶ 4. However, in reality, the Protocol's valuations were at all relevant times "tied solely to pricing data on Coinbase Pro." *Id.* ¶ 40. As a result — despite Compound's claims that the Protocol was designed to "avoid[] the risks of centralized exchanges . . . such as hacks, theft, and 'incorrectly closing out a position,'" *id.* ¶ 27 (alteration adopted) — users faced "significant risk" of "immediate and potential long-term loss" due to "unjustified liquidation" in the event of an error in Coinbase Pro's pricing data. *Id.*; *see id.* ¶ 54. That risk materialized for Celsius in November 2020.

Celsius was, at one time, "one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world." *Id.* ¶ 19. As of November 2020, Celsius was also a Protocol user: it had deposited a crypto token (Ethereum, or "ETH") as collateral on the Protocol and borrowed certain amounts of two other crypto assets. *Id.* ¶ 55. On November 26, 2020, Coinbase Pro "mistakenly and falsely indicated" that the value of one of those borrowed assets had increased by 30%. *Id.* ¶ 57. This error "was only momentary," but it shifted Celsius's collateral ratio to an unacceptable level and, therefore, triggered the liquidation of Celsius's collateral. *Id.* ¶ 57; *see id.* ¶ 6.[1]

---

[1] Technically, the Protocol did not liquidate the actual asset that Celsius had posted as collateral, but rather the cTokens that entitled Celsius to recover that collateral. *See* FAC ¶ 57 (alleging that Celsius's "cETH equivalent to more than 50,000 . . . ETH" was liquidated). cTokens are explained in section I.B. of this Opinion's background section.

**B.**      **The Protocol Tokens**

In addition to holding deposited assets and facilitating loans, the Protocol issues two crypto tokens of its own: cTokens, *id.* ¶ 30, and Compound tokens ("COMP"), *id.* ¶ 26.

cTokens "track a depositor's earned interest." *Id.* ¶ 30. Users receive cTokens when they deposit an asset onto the Protocol, and the type of cToken they receive corresponds to the type of asset they deposit — for example, a user who deposits ETH "would receive cETH tokens to denote their investment ownership rights and to earn interest and rewards in the form of cTokens." *Id.* And indeed, because Celsius "stored" approximately 50,000 ETH on the Protocol as collateral for its borrowing activity, Celsius "received" over 2.5 million cETH from the Protocol. *Id.* ¶ 55-56. The FAC does not explain what rewards cToken holders receive or how those rewards accrue. However, users "are supposed to receive more of the underlying asset than their initial deposit" upon "redeem[ing] their cTokens." *Id.* ¶ 30. cTokens are redeemable "at any time" and can be "traded on secondary markets freely." *Id.*

COMP is a governance token that gives its holders the power "to suggest and vote on actions" affecting the Protocol. *Id.* ¶¶ 26, 43-44. Compound created COMP as part of its effort to transfer control over the Protocol from itself to a "soon-to-be formed" Decentralized Autonomous Organization (the "Compound DAO"). *Id.* ¶¶ 42-44. Because DAOs have no "formal corporate structures" and do not "distin[guish] between managers and directors or general partners," *id.* ¶ 43, they operate through "community governance" facilitated by governance tokens like COMP. *Id.* ¶ 26. In addition to conferring governance power, COMP also entitles its holders to a "commission on each outstanding loan" arranged through the Protocol. *Id.* ¶ 31. The Protocol determines the amount of that commission. *Id.* Therefore, according to the FAC, COMP functions as "a claim on the [Compound] DAO's future earnings, and so [is] analogous to interest in a partnership." *Id.* ¶ 46.

4

The FAC appears to allege that Protocol users may obtain COMP in multiple ways.  One way to do so seems to be by purchasing it directly from Compound; indeed, the FAC alleges that, in or around February 2020, "Leshner urged potential investors to purchase COMP and stated that participating in the DAO starts with . . . COMP."  *Id.* ¶ 45 (internal quotations omitted).  Users (and non-users) can also purchase COMP "on secondary markets" from its primary holder.  *Id.* ¶ 46.  Finally, it appears that users "receive[] COMP tokens for using the [P]rotocol and paying fees" in connection with their borrowing activity.  *Id.* ¶ 46; *see also id.* ¶ 31 ("To further induce borrowing on the [Protocol], users receive COMP tokens for borrowing on the [Protocol.]").  Celsius, according to the FAC, held COMP in this way: "by virtue of its borrowing position" on the Protocol.  *Id.* ¶ 53.

### C.    Control Over the Protocol

Leshner "publicly expressed" his desire that the Protocol be controlled by the "community governance" of a DAO.  *Id.* ¶ 49.  Indeed, in May 2020 he "stated publicly" that such governance was "ready to scale from [Compound's] core team and shareholders to the entire [Protocol] ecosystem."  *Id.* ¶ 48.  In fact, however, "Leshner, Hayes, and [Compound] consciously planned and acted to ensure that insiders would retain control over the Compound DAO."  *Id.* ¶ 49.  COMP "was programmed so that only 10,000,000 COMP tokens may ever be issued," *id.* ¶ 44, and Compound's initial "supply schedule" provided that Compound's own "founders and team, shareholders, and future team members" would hold 57.8% of them, *id.* ¶ 50 (internal quotations omitted).  Indeed, "[t]he first COMP tokens were issued in early 2020" to Leshner, Hayes, and other Compound shareholders.  *Id.* ¶ 47.

According to the FAC, there was "another version" of the COMP supply schedule, which provided that Compound and its insiders would "eventually hold slightly less than 50% of the outstanding COMP."  *Id.* ¶ 51.  The FAC does not allege which version of the supply schedule

Compound ultimately followed in distributing COMP, and it does not allege that all 10,000,000 COMP tokens have been either issued or distributed. However, the FAC alleges that, "[u]pon information and belief," Leshner, Hayes, and Compound, "at all times relevant" — including during the November 2020 liquidation of Celsius's collateral — "exercised control over the operations of the [Protocol] and/or the Compound DAO such that they were general partners in-fact of the Compound DAO." *Id.* ¶ 52.

## II.    Procedural History

On July 13, 2022, Celsius filed a voluntary Chapter 11 Petition with the Southern District of New York Bankruptcy Court. *See In re Celsius*, 670 B.R. 379, 386 (S.D.N.Y. 2025). Meghji was appointed the Litigation Administrator for Celsius and its affiliated debtors. *Id.* at 385. In that capacity, on July 12, 2024, Meghji filed a complaint against only Compound, alleging negligence, negligent misrepresentations, and professional malpractice in connection with the liquidation of Celsius's collateral. *See generally* Dkt. 20 (the "Original Complaint" or "Compl."). The Original Complaint alleged many of the facts recited above, including the general functioning of the Protocol, Compl. ¶¶ 22-32; that Celsius had deposited collateral onto the Protocol to engage in borrowing, *id.* ¶ 38; that the Protocol based its valuation of that collateral on only one pricing source, despite the Whitepaper's representation that valuation was based on ten pricing sources, *id.* ¶¶ 33-34; that a temporary error in that pricing source led to the liquidation of Celsius's collateral, *id.* ¶¶ 39, 41; and that governance of the Protocol began with "centralized control," but that Compound intended to transition to "community and stakeholder control," *id.* ¶ 36.

On November 1, 2024, Meghji filed an amended complaint against Compound, the Individual Defendants, and Compound DAO. *See generally* FAC. In it, Meghji added Compound DAO to Celsius's negligence claim, and added the Individual Defendants to its

6

negligent misrepresentation and professional malpractice claims. *Id.* ¶¶ 62-85. Meghji also pleaded two additional causes of action: violation of Rule 10b-5 against all Defendants, and breach of fiduciary duty against the Moving Defendants. *Id.* ¶¶ 86-102.

Meghji filed the Original Complaint and the FAC in an adversary proceeding within Celsius's broader Chapter 11 proceedings, and therefore the matter was automatically referred to the Bankruptcy Court. However, this Court withdrew the reference, because resolution of the FAC's securities claims required "more than the 'routine application of federal laws,'" and because judicial efficiency called for Celsius's common-law claims to be decided at the same time. *In re Celsius*, 670 B.R. at 390, 393-94 (quoting *In re Enron Corp.*, No. 04-cv-08177 (RCC), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004)). The Moving Defendants' motion to dismiss the FAC pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) is now fully briefed. *See* Dkt. 32 ("MTD"); Dkt. 33 ("Br."); Dkt. 42 ("Opp."); Dkt. 44 ("Reply").

## LEGAL STANDARD

Rule 12(b)(6) applies to adversary proceedings through Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012. *See* Fed. R. Bankr. P. 7012. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 162 (2d Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In evaluating a complaint on such a motion, the Court accepts "as true all of the factual allegations set out in plaintiff's complaint, draw[s] inferences from those allegations in the light most favorable to plaintiff, and construe[s] the complaint liberally." *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025) (quoting *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009)).

7

**DISCUSSION**

## I.    Relation Back

As a threshold matter, the Moving Defendants argue that the FAC's negligent misrepresentation and professional malpractice claims against the Individual Defendants, and its new claims against the Moving Defendants, must all be dismissed because they are barred by the applicable statutes of limitations and do not relate back to the Original Complaint.  Br. at 14-18. Meghji does not contest that these new claims are outside the applicable statutes of limitations, but instead argues that they relate back because they "all arise out of the same conduct, transaction, or occurrence as alleged in the Original Complaint and seek recovery from parties that are united in interest with original Defendant Compound."[2]  Opp. at 8.  The Court agrees in part with Meghji, and in part with the Moving Defendants.

### A.    The Addition of the Individual Defendants

As discussed, the FAC newly names the Individual Defendants and asserts new and existing claims against them under federal and common law.  These claims do not relate back.

---

[2] In a footnote in his opposition brief, Meghji asserts that his breach of fiduciary duty claim is timely pleaded under California's four-year statute of limitations, which, he says, applies to the claim because it is shorter than New York's six-year statute of limitations.  *See* Opp. at 9 n.4; *see also id.* at 36 (arguing California substantive law applies to breach of fiduciary duty claim). Though he does not cite it, Meghji is invoking N.Y. C.P.L.R. § 202, which "mandat[es] use of the *shortest* statute of limitations available" when "out-of-state plaintiffs" bring claims in New York courts.  *In re Coudert Bros. LLP*, 673 F.3d 180, 190 (2d Cir. 2012).  But Meghji is incorrect about New York's statute of limitations for this claim: "A three-year limitations period applies to claims for breach of fiduciary duty."  *Liberty Cap. Grp. v. Oppenheimer Holdings, Inc.*, 802 F. Supp. 3d 701, 711 n.6 (S.D.N.Y. 2025).  The period is six years only where "the relief sought is equitable in nature" or where "an allegation of fraud is essential to" the claim. *Jadidian v. Goldstein*, 179 N.Y.S.3d 140, 141 (N.Y. App. Div. 2022) (quoting *Matter of Hersh*, 156 N.Y.S.3d 243, 248 (N.Y. App. Div. 2021)).  Neither situation applies here: Meghji seeks money damages, *see* FAC at 22, and fraud is not essential to his breach of fiduciary duty claim. Therefore, New York's three-year statute of limitations is the shortest available, and Celsius's breach of fiduciary duty claim is not timely pleaded, absent relation back.

Under Federal Rule of Civil Procedure ("Rule") 15, amendments to a complaint "relate[]

back to the date of the original pleading" under three circumstances: (1) where relation back is

permitted by "the law that provides the applicable statute of limitations," Fed. R. Civ. P.

15(c)(1)(A); (2) where the amended claim "arose out of the conduct, transaction, or occurrence"

pleaded in the original complaint, Fed. R. Civ. P. 15(c)(1)(B); or (3) where the amendment adds

a party to the suit and satisfies Rule 15(c)(1)(B), and the new party (i) had "notice of the action"

and (ii) knew or should have known that they would have been named in the suit originally "but

for a mistake concerning the[ir] proper . . . identity," Fed. R. Civ. P. 15(c)(1)(C)(i)-(ii); *see* Fed.

R. Bankr. P. 7015 (applying Rule 15 to adversary proceedings).  Under Rule 15(c)(1)(C), the

mistake can be factual, "*i.e.,* that [plaintiff] misapprehended the identities of the individuals she

wished to sue," or it can be legal, "*i.e.,* that she misunderstood the legal requirements of her

cause of action."  *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 36 (2d Cir. 1996); *see also Ceara*

*v. Deacon*, 916 F.3d 208, 214 (2d Cir. 2019) (permitting relation back where plaintiff "knew and

included [defendant]'s name, but garbled the spelling").  But "[w]hen the original complaint and

the plaintiff's conduct compel the conclusion that the failure to name the defendant in the

original complaint was the result of a fully informed decision as opposed to [such a] mistake . . .,

the requirements of Rule 15(c)(1)(C)(ii) are not met."  *Krupski v. Costa Crocerie S. p. A.*, 560

U.S. 538, 552 (2010).

New York's concept of mistake in the relation-back context is "more forgiving."  *Hogan*

*v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013).  It permits amendment to name a party previously

omitted not just due to "a mistake of law," but also due to "a simple oversight."  *Nemeth v. K-*

*Tooling*, 224 N.E.3d 513, 519 (N.Y. 2023).  But even this more liberal standard requires *some*

form of mistake.  *See id.* at 516 (explaining that relation back "does not apply when a plaintiff

'intentionally decides not to assert a claim against a party known to be potentially liable' or when

9

the new party was omitted 'to obtain a tactical advantage in the litigation'" (quoting *Buran v. Coupal*, 661 N.E.2d 978, 983 (N.Y. 1995))). The mere failure to name a party in the original complaint "does not automatically establish a mistake." *Id.* at 520.

Meghji has not provided — and the Original Complaint does not indicate — any basis to conclude that he initially omitted the Individual Defendants by mistake within the meaning of federal or New York law. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-03146 (DLC), 2004 WL 540450, at *5 (S.D.N.Y. Mar. 19, 2004) (finding no relation back where "plaintiff made a strategic decision to name only one of two entities with potential liability for certain conduct"). Meghji's reliance on *Nemeth*, 224 N.E.3d at 518-20, is therefore misplaced. *See* Opp. 11-12. In *Nemeth*, a zoning board granted a variance to a corporation, and the plaintiffs' first petition challenging the board's decision named the corporation and its individual owners. *Nemeth*, 224 N.E.3d at 517. After the variance was annulled, the corporation obtained a new variance from the zoning board; the plaintiffs filed a second petition challenging the second variance but failed to name the owners, and later sought to amend to add one of them. *Id.* The New York Court of Appeals found that "[t]he only logical conclusion" from that procedural history was "that [the] omission from the second petition was a mere oversight" that did not preclude relation back. *Id.* at 521. The procedural history in this case does not support the same conclusion.

The Court agrees with Meghji that the Moving Defendants have not demonstrated that he had a sinister motive for, or gained a tactical advantage by, belatedly naming the Individual Defendants, *see* Opp. at 13, but it is not their burden to make that showing. "The burden is on [the] [p]laintiff to establish the applicability of the relation back doctrine." *Anderson v. City of Mount Vernon*, No. 09-cv-07082 (ER) (PED), 2014 WL 1877092, at *3 (S.D.N.Y. Mar. 28, 2014); *see also Nemeth*, 224 N.E.3d at 520 ("[O]mission . . . does not automatically establish a

10

mistake"). Meghji has not identified any mistake or oversight that caused him to omit the Individual Defendants from the Original Complaint, and nothing before the Court indicates what that mistake could have been. For example, a plaintiff may be mistaken as to the identity of the defendant; "[t]he classic example" of such a mistake "is when a plaintiff sues the wrong defendant, such as an agency instead of an agency head." *Dennis v. JPMorgan Chase & Co.*, 439 F. Supp. 3d 256, 263 (S.D.N.Y. 2020). That is not what happened here, and indeed Meghji appears to concede that he was not mistaken as to the Individual Defendants' identities. *See* Opp. at 13. Indeed, in responding to the Moving Defendants' argument that he was not mistaken as to the Individual Defendants' identities, Meghi simply contends that New York relation-back doctrine applies to all his amendments, Opp. at 9, and that this doctrine allows him to add new parties due to mistakes over issues other than identity, *id.* at 13. But if Meghji was not mistaken as to the Individual Defendants' identities, and indeed he was well aware of their identities from the Whitepaper, what was the nature of his mistake? He does not say. In his silence, he falls short of New York law's requirements and thus simply neglected to include them as defendants. *See Nemeth*, 224 N.E.3d at 519-20.[3]

---

[3] Meghji further invokes New York's "conduct, transaction, or occurrence" test (analogous to Rule 15(c)(1)(B)) in justifying his claims against the Individual Defendants. *See* Opp. at 11-12. Of course, New York law does not apply to the newly pleaded federal claim. *See Abdell v. City of New York*, No. 05-cv-08453 (KMK) (JCF), 2006 WL 2620927, at *2 (S.D.N.Y. 2006) (explaining that courts look to state law for relation-back only when "the claim arises under state law, or [when] the court borrows a state statute of limitations" (quoting *Smith v. Rochester Tel. Bus. Mktg. Corp.*, 786 F. Supp. 293, 309 (W.D.N.Y. 1992), *aff'd* 40 F.3d 1236 (2d Cir. 1994))). But that problem aside, Meghji has cited no authority that would permit him to sidestep Rule 15(c)(1)(C) or its state-law counterpart in this way when adding new defendants. *See, e.g., Leber v. Citigroup 401(K) Plan Inv. Committee*, 129 F. Supp. 3d 4, 17 (S.D.N.Y. 2015) (explaining that "plaintiffs must satisfy the requirements of Rule 15(c)(1)(C) in addition to Rule 15(c)(1)(B)" when "adding additional defendants").

Therefore, neither federal law nor New York law permits Meghji to add the Individual Defendants to the FAC.  Accordingly, all claims against the Individual Defendants must be dismissed as untimely.

Although the Compound DAO has not joined the Moving Defendants in their motion to dismiss, the same analysis applies to Meghji's addition of the Compound DAO to Celsius's negligence claim, and therefore Compound DAO must also be dismissed from this case.  *See Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980) (explaining that "[t]he district court has the power to dismiss a complaint sua sponte for failure to state a claim . . . [and] [t]here appears to be no reason why the same rule should not apply to a dismissal on statute of limitations grounds[.]"); *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (noting that statute of limitations defenses are properly brought under Rule 12(b)(6)).

## B.        The New Claims Against Compound

The FAC also newly asserts a Rule 10b-5 claim and breach of fiduciary duty claim against Compound, and Meghji contends that these are "textbook examples" of claims that relate back because they arise out of the same transaction as the originally pleaded claims.  Opp. at 10. The Court finds that these claims do not relate back.

### 1.  Relation Back of the Federal Claim

A new claim against an existing defendant relates back under Rule 15(c)(1)(B) if it "arise[s] out of the conduct set forth in the original pleading," but "[t]he central inquiry is whether . . . the general fact situation alleged in the original pleading" gives "adequate notice [to the defendant] of the matters raised in the amended pleading."  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014) (quoting *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006)); *see also Dunham v. Oliver*, No. 11-cv-01223 (ALC) (SLC), 2019 WL 5540965, at *6 (S.D.N.Y. Oct. 28, 2019) (applying Rule 15(c)(1)(B) to new claims against existing defendants).

Accordingly, while "a plaintiff need not set forth 'an intricately detailed description of the asserted basis for relief,'" he still "must inform the defendants of the facts that support th[e] new claims." *In re M. Fabrikant & Sons, Inc.*, 480 B.R. 480, 492 (S.D.N.Y. 2012) (first quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984); and then quoting *Barr v. Charterhouse Grp. Int'l, Inc.*, 238 B.R. 558, 574 (Bankr. S.D.N.Y. 1999)).

The Moving Defendants argue that they did not receive sufficient notice of Celsius's Rule 10b-5 claim against Compound because "the issues of . . . scienter, or a connection with securities transactions (among others) were not pleaded in support of the original negligence-based claims." Br. at 17. The Court agrees.

The Original Complaint set forth many of the operative facts of the transaction upon which the Rule 10b-5 claim is premised — the deposit of Celsius's collateral, a misrepresentation that the Protocol's valuation process was based on ten price inputs when in fact it was based on one, reliance on that misrepresentation, and the wrongful loss of Celsius's collateral based on an error in that sole price input, *see* Original Compl. ¶¶ 33-41, 52-53 — but it omitted other key facts. Specifically, as the Moving Defendants argue, the Original Complaint's pleadings in support of its negligence-based claims contain no factual allegations that Compound acted with scienter, that the posting of collateral on the Protocol constituted a purchase of securities, that cTokens and COMP have characteristics consistent with securities, or that the Whitepaper's misrepresentations induced Celsius to purchase cTokens and COMP.[4] These allegations are central to Celsius's Rule 10b-5 claim. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648-49 (2010) ("A plaintiff cannot recover [under section 10(b)] without proving that a

---

[4] Indeed, the Original Complaint mentions COMP only one time, and only to define it as "an Ethereum Request for Comment Number 20 ('ERC-20') token that facilitates the community governance of Compound." Original Compl. ¶ 23.

13

defendant made a material misrepresentation *with an intent to deceive* — not merely innocently or negligently."); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975) (holding that Rule 10b-5 plaintiffs are "limited to actual purchasers and sellers of securities"). In the absence of these pleadings, the Moving Defendants were not "inform[ed] . . . of the facts that support th[e] new claims." *In re M. Fabrikant & Sons*, 480 B.R. at 492. *See Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87-cv-06125 (KMW), 1990 WL 136038, at *6-7 (S.D.N.Y. Sept. 13, 1990) (holding that newly pleaded RICO claim did not relate back where original complaint "did not allege fraud"); *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1133-34 (C.D. Cal. 2011) (holding that securities fraud claim did not relate back where original complaint "was explicitly missing facts necessary to plead a fraud claim," and noting that while a later-filed misrepresentation-based claim may relate back to a previously pleaded securities fraud claim, "[t]he reverse is not true: a [misrepresentation] plaintiff need not have pled scienter, reliance, or loss causation in its earlier complaint" ). Therefore, Celsius's Rule 10b-5 claim against Compound does not relate back to the Original Complaint.

### 2. Relation Back of the Common Law Claim

The FAC further asserts a new claim against Compound for breach of fiduciary duty. It roots that claim in the theory that Compound was a "general partner[] in fact over the Compound DAO by virtue of [its] ownership interests," FAC ¶ 98, which it supports with new factual allegations concerning the distribution of COMP tokens that created those purported ownership interests, *id.* ¶¶ 42-53. In particular, the FAC newly alleges that Compound publicly purported to create COMP as part of its plan to transition Protocol control to the Compound DAO, but that Compound in fact steered COMP to its insiders to retain control over the Compound DAO (and, thus, the Protocol). *Id.* ¶¶ 48-52. These facts support the claim that Compound and the Individual Defendants "share[d] decision making and ownership" over the Compound DAO.

14

FAC ¶ 99.  The Moving Defendants contend that the Original Complaint "made no reference to a 'Compound DAO partnership,' and the issue[] of partnership formation . . . w[as] not pleaded in support of the original negligence-based claims."  Br. at 17.  Meghji counters that the new breach of fiduciary duty claim "arise[s] out of the November 2020 liquidation event," and that "the Original Complaint need not have put Defendants on notice of every factual allegation upon which the subsequent claims depend for relation back to apply."  Opp. at 10.  The Court agrees with the Moving Defendants.

Because New York law determines the statute of limitations for this common-law claim, New York law determines whether it relates back to the Original Complaint.  *See* Rule 15(c)(1)(A); *see also Stafford v. Int'l Harvester Co.*, 668 F.2d 142, 147 (2d Cir. 1981) ("New York will apply its own statute of limitations even though the injury which gave rise to the action occurs in another state."); *GE Transp. Parts, LLC v. Cent. Ry. Mfg., LLC*, No. 19-cv-04826 (AJN), 2021 WL 827146, at *2 (S.D.N.Y. Mar. 4, 2021) ("New York follows the traditional rule that statutes of limitations are procedural, and thus its own statute of limitations generally applies even where another state's substantive law governs."); *supra* Section I.A. n.2 (concluding that New York's statute of limitations applies over California's under N.Y. C.P.L.R. § 202).

In New York, a newly pleaded claim against an existing defendant relates back "unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading."  N.Y. C.P.L.R. 203(f).  In other words, New York, much like federal law, requires that the initial pleadings "put defendants on notice of the transactions and occurrences" pleaded in the amendment.  *Lazar v. Mor*, 227 N.Y.S.3d 277, 278 (N.Y. App. Div. 2025); *see Pendleton v. City of New York*, 843 N.Y.S.2d 648, 652 (N.Y. App. Div. 2007) ("The sine qua non of the relation-back doctrine is notice.").  "Thus, when the nature of a newly asserted cause of action is distinct from the causes

15

of action asserted in the original complaint, and requires different factual allegations as to the underlying conduct than were contained in the original complaint, the new claims will not 'relate back'" to the original complaint. *Calamari v. Panos*, 16 N.Y.S.3d 824, 827 (N.Y. App. Div. 2015).

Here, Celsius's breach of fiduciary duty claim relies on new factual allegations of which the Original Complaint did not provide notice. Primarily, it relies on allegations that Compound distributed COMP to itself in order to retain control over the Compound DAO, and these allegations establish the fiduciary duty newly alleged to have been breached. The Original Complaint mentions COMP, *see* Original Compl. ¶ 23, but it makes no allegation concerning the Moving Defendants' distribution of that COMP to themselves, nor the creation of any fiduciary relationship. In fact, the Original Complaint does not mention the Compound DAO. Counsel conceded these omissions at oral argument. *See* Feb. 12, 2026 Tr. ("Tr.") 45:13-46:14; 60:10-15. As such, this new claim "arise[s] from different facts and implicate[s] different duties from the ones previously raised, and therefore go[es] beyond mere amplification of the pleadings." *G&Y Maint. Corp. v. 540 W. 48th St. Corp.*, 227 N.Y.S.3d 32, 34 (N.Y. App. Div. 2025). Therefore, it does not relate back to the Original Complaint.

*          *          *

In light of the foregoing rulings, the Individual Defendants and Compound DAO are dismissed from this action, and Count V is dismissed in its entirety. The Court will now evaluate the remaining original claims against Compound: Count I (negligence), Count II (negligent misrepresentation), and Count III (professional malpractice).

II.   **The Sufficiency of the Common Law Claims**

A.   **Choice of Law**

As a threshold matter, the Court must determine which state's law applies to Celsius's remaining common-law claims.  In their opening brief, the Moving Defendants apply Delaware law because, although the FAC does not plead which state's law applies or which Celsius entity owned the collateral posted to the Protocol, Compound "is a Delaware corporation and Celsius Network LLC and Celsius KeyFi, LLC are Delaware limited liability companies."  Br. at 18 n.27.  In his opposition brief, Meghji applies New Jersey law to these claims, because New Jersey is "the principal place of business for both Celsius Network LLC and Celsius KeyFi, LLC," and therefore New Jersey is "where Celsius sustained the economic impact" of and "suffered injury" from these torts.  Opp. at 15.  On reply, the Moving Defendants point out that the FAC does not identify Celsius Network LLC as an entity "relevant to this lawsuit," Reply at 5 n.6 (quoting FAC ¶ 8), but they do not otherwise continue to press for the application of Delaware law.  For the following reasons, the Court will apply New Jersey law.

A federal court adjudicating state-law claims in a bankruptcy proceeding applies the choice-of-law rules of the state in which it sits, unless there exists a "significant federal policy[] calling for the imposition of a federal conflicts rule."  *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (quoting *In re Gaston & Snow*, 243 F.3d 599, 607 (2d Cir. 2001)).  Because there is no such overriding policy here, the Court applies New York's choice-of-law rules.  *See, e.g.*, *In re Coudert Bros.*, 673 F.3d at 190-91 (declining to apply New York choice-of-law to bankruptcy case where doing so would "allow the defendant . . . to use a device of federal law" to forum shop).

In New York, the first question in a choice-of-law analysis is "whether there is an actual conflict of laws," such that "the applicable law from each jurisdiction provides different

substantive rules" that may affect the outcome. *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014) (first quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998); and then quoting *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331-32 (2d Cir. 2005)). Meghji asserts, and at oral argument the Moving Defendants agreed, that there is a conflict between New Jersey and Delaware law with respect to Celsius's common-law claims. *See* Opp. at 15; Tr. 14:7-14. *See also Van Bourgondien-Langeveld v. Van Bourgondien,* No. 10-cv-00077 (JFB) (WDW), 2010 WL 5464890, at *7 n.3 (E.D.N.Y. Dec. 29, 2010) (accepting parties' conflict of law argument where parties "do not address" substantive differences between conflicted jurisdictions "in their motion papers").

The question, then, is which state's substantive law applies. In tort cases, New York's choice-of-law rules require that courts apply "the law of the state with the most significant interest in the litigation." *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (quoting *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999)). The method used in weighing such interests depends on whether the tort regulates conduct or allocates loss. *Id.* Where the tort concerns a "conduct regulating" rule, the Court applies the law of the state where the tort occurred, which is sometimes called the *lex loci delicti* rule. *Id.* Here, Celsius's common-law claims are all conduct-regulating. *See Bak v. Metro-North RR Co.*, 100 F. Supp. 3d 331, 338 (S.D.N.Y. 2015) ("The law of negligence is a conduct-regulating rule because it seeks to hold defendants to a standard of care."), *rev'd on other grounds*, 650 F. App'x 63 (2d Cir. 2016); *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 522 (S.D.N.Y. 2013) ("[T]he elements of negligent misrepresentation constitute conduct-regulating rules."); *Geswaldo v. Gottleib*, No. 24-cv-02543 (AT) (SDA), 2025 WL 763995, at *5 (S.D.N.Y. Jan. 14, 2025) ("Under New York law, professional malpractice is a species of negligence." (quoting *Hydro*

18

*Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000)), *report and recommendation adopted*, 2025 WL 636091 (S.D.N.Y. Feb. 27, 2025).

Accordingly, the Court will apply the law of the state in which Celsius's injury occurred. Because the Celsius entities at issue here maintain their principal places of business in New Jersey — not Delaware — Celsius's injury occurred in New Jersey.[5] *See Elavon, Inc. v. Katz*, No. 23-1259, 2025 WL 1202075, at *4 (2d Cir. Apr. 25, 2025) (summary order) (holding that corporation's injury occurred at its principal place of business, because "an economic harm [seemingly] has greater effect on a for-profit enterprise's activities at its principal place of business rather than at its place of incorporation" (alteration in original) (quoting *Luv N' Care, Ltd. v. Goldberg Cohen, LLP*, 703 F. App'x 26, 28 n.1 (2d Cir. 2017) (summary order)); *see also MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 606 (S.D.N.Y. 2016) (finding that "the locus of the tort" was the state of plaintiff's domicile). Therefore, New Jersey law applies.

In addition, the Moving Defendants do not insist on the application of Delaware law in their Reply; rather, the Moving Defendants cite New Jersey case law and contend that Celsius's claims fail in that jurisdiction, too. Reply at 5. Thus, the Moving Defendants have waived their argument that Delaware law governs Celsius's common-law claims, and this waiver is an additional and independent basis for the Court's application of New Jersey law. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (where "the parties' briefs assume" that a particular state's law governs the case, "such implied consent is . . . sufficient to establish the

---

[5] The FAC also identifies England as the principal place of business of another Celsius entity, Celsius Network Limited. FAC ¶ 9. However, neither Meghji nor the Moving Defendants contend that English law applies to these claims. Moreover, the FAC alleges that "[a]ll customer relationships within the broader Celsius enterprise were transitioned from" this entity to Celsius Network LLC, *id.* ¶ 10, which suggests that little business activity occurs in England.

applicable choice of law" (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

### B.    Economic Loss Doctrine

As a second threshold matter, the Moving Defendants contend that all three of Celsius's remaining common-law claims are barred by the economic loss doctrine, because they sound in tort but allege only economic injury.  *See* Br. at 18-19; Reply at 5-7.  This argument misunderstands New Jersey's economic loss doctrine.

In New Jersey, "the economic loss doctrine prohibits the recovery in a tort action of economic losses arising out of a breach of contract."  *Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 150 n.2 (N.J. 2020).  Thus, contrary to the Moving Defendants' contention, *see* Br. at 18, the doctrine does not bar tort claims simply because the alleged injury is economic, but rather prevents plaintiffs from "using tort law to alter contractual remedies or to replace a breach of contract action."  *Svigals v. Lourdes Imaging Assocs., P.A.*, No. 18-cv-01736, 2018 WL 6178863, at *4 (D.N.J. Nov. 27, 2018); *see Ergowerx Int'l LLC v. Maxwell Corp. of Am.*, No. A-0197-16T3, 2017 WL 3160270, at *1 (N.J. Super. Ct. App. Div. 2017) (per curiam) ("[W]hen a party's entitlement to damages arises from a breach of contract, it is barred from recovering economic loss in tort as well."); *Symbiont Sci. Eng. & Constr., Inc. v. Ground Improvement Servs.*, 723 F. Supp. 3d 363, 380 (D.N.J. 2024) (explaining that the economic loss doctrine is intended to root out "contract claim[s] in tort clothing" (quoting *SRC Constr. Corp. of Monroe v. Atl. City Hous. Auth.*, 935 F. Supp. 2d 796, 801 (D.N.J. 2013))); *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 249 (3d Cir. 2010) (applying economic loss doctrine to bar plaintiff from "pursu[ing] tort remedies" where "the U.C.C. permits recovery").  It follows that the economic loss doctrine does not apply where, as here — and as Meghji points out, Opp. at 15

n.7; *see generally* FAC — "there is no contract between the parties" upon which the plaintiff can sue. *Symbiont*, 723 F. Supp. 3d at 380 (collecting cases).[6]

The parties argue over whether Celsius's claims satisfy the economic loss doctrine's "foreseeability/special relationship exceptions," Opp. at 15-17; Reply at 5-7, but they are skipping a step: no exception to the doctrine is required here, because Celsius has not asserted a contract claim and, therefore, its tort claims do not fall under the economic loss doctrine as an initial matter.[7]

Therefore, Celsius's common-law claims are not barred by New Jersey's economic loss doctrine. Dispensing with this additional threshold issue, the Court next examines each of Celsius's claims.

### C.      Negligence Claim

Celsius first brings a claim against Compound for negligence. *See* FAC ¶¶ 62-66. "[T]he fundamental elements" of negligence under New Jersey law "are [(1)] a duty of care owed by the defendant to the plaintiff, [(2)] a breach of that duty by the defendant, [(3)] injury to the plaintiff

---

[6] Elsewhere in their briefing, the Moving Defendants point out that the FAC does not allege how Celsius interacted with the Protocol, and that Celsius would be "bound by a contractual Terms of Service" if that interaction was through Compound's "front end." Br. at 3 n.3. Because there are no pleaded facts on this point, and because the Court must construe the FAC in the light most favorable to Celsius, the Court cannot and does not assume that such a contractual relationship exists between the parties here.

[7] Arguments over whether the parties need to be in privity for the economic loss doctrine to apply also miss the mark. *See* Opp. at 15 n.7; Reply at 7. As the court explained in *Schenker, Inc. v. Expeditors Int'l of Washington, Inc.* — which the Moving Defendants cite, Reply at 7 — the economic loss doctrine does not require *privity* of contract between the parties, but it does require *a contract* through which the plaintiff can recover. No. A-3555-14T1, 2016 WL 3563187, at *2 (N.J. Super. Ct. App. Div. July 1, 2016) (explaining that "the economic loss doctrine bars negligence claims when the party asserting the action has *a* contractual remedy," and citing a case applying the doctrine "where there [was] a series of interrelated contracts, even despite privity" (emphasis added)).

proximately caused by the breach, and [(4)] damages." *J.H. v. R&M Tagliareni LLC*, 216 A.3d 169, 180 (N.J. 2019) (quoting *Robinson v. Vivirito*, 86 A.3d 119, 124 (N.J. 2014)).

### 1. Duty of Care

As to the first element, the existence of a duty of care under New Jersey law "is ultimately a question of fairness" that requires courts to consider "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Estate of Desir ex rel. Estiverne v. Vertus*, 69 A.3d 1247, 1258 (N.J. 2015) (first quoting *Weinberg v. Dinger*, 524 A.2d 366, 374 (N.J. 1987); and then quoting *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1116 (N.J. 1993)).  At the motion to dismiss stage, a plaintiff "need only allege sufficient facts for a court to find a basis for the imposition of a duty" in considering these factors.  *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp, Inc.*, No. 11-2775, 2012 WL 762498, at *11 (D.N.J. Mar. 6, 2012).  Reviewing the FAC with these factors in mind, the Court finds that it adequately alleges that Compound owed Celsius a duty of care.

As to the parties' relationship, the Moving Defendants argue that Compound is merely a "creator of open-source software," and that courts have repeatedly declined to impose a duty of care on such defendants with respect to their end users.  Br. at 21.  But the cases they cite, *see id.*, involve software used for a purpose much different than that alleged here, such as processing payments, storing data, or providing information to consumers.  *See Goddess Approved Prods., LLC v. Wolox*, No. 20-cv-01697, 2022 WL 4535620, at *1 (D. Del. Sept. 28, 2022) (software developed for an app that would "let[] consumers use their phones to identify groceries' nutritional information"); *PC Connection, Inc. v. Int'l Bus. Machs. Corp.*, 687 F. Supp. 3d 227, 257 (D.N.H. 2023) (software "used for a variety of business functions" such as "processing orders, shipments, [and] payments"); *Avazpour Networking Servs., Inc. v. Falconstor Software,*

*Inc.*, 937 F. Supp. 2d 355, 357 (E.D.N.Y. 2013) (software used "for storing and protecting client data").[8]  Here, in contrast, the Protocol stores, and at times liquidates, its users' blockchain assets.  FAC ¶ 33.  This creates a relationship of a different nature than that between a software provider and purchaser.  Indeed, the FAC alleges that Compound held the Protocol out as giving its users "a safe positive-yield approach to storing assets," *id.*, that "avoided the flaws of existing approaches, such as hacks, theft and incorrectly closing out a position," FAC ¶ 27 (citation modified).  Moreover, the FAC alleges not only that the Protocol accepts users' deposited assets as collateral for loans, FAC ¶¶ 29-30, but also that the Protocol *requires* the posting of such collateral to engage in any lending activity through the Protocol, FAC ¶ 36.

Accordingly, the FAC alleges a relationship akin to a bailment between Celsius and Compound.  *See Bailment*, Black's Law Dictionary (12th ed. 2024) (defining bailment as "[a] delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose").  And New Jersey courts recognize that bailments impose upon the property-holder a duty of reasonable care with respect to the property held.  *See McCormick 106, LLC v. May*, No. A-5848-17T2, 2019 WL 3761769, at *3 (N.J. Super. Ct. App. Div. Aug. 9, 2019) ("[T]he law in our State recognizes that a bailee of personal property has a 'duty to

---

[8] The Moving Defendants cite two additional cases concerning the absence of a "special relationship" between computer consultants and their clients.  These are inapposite, as they concern the availability of an exception to the economic loss doctrine.  But to the extent they bear on the imposition of a duty of care, the first is distinguishable in the same way as the other cases cited.  *See Bruderman Asset Mgmt., LLC v. Real Time Consultants, Inc.*, No. 20-cv-03164 (VSB), 2021 WL 1863971, at *1 (S.D.N.Y. May 9, 2021) (contract for computer consultant to support and troubleshoot plaintiff's Microsoft Office and other network usage).  And the second supports the existence of a duty here: While the court in *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942 (S.D. Cal. 2014) found no special relationship sufficient for purposes of the economic loss exception, it nevertheless held, as a matter of "common sense and California and Massachusetts law," that the network provider had a "legal duty to safeguard [its] consumer's confidential information entrusted to [it]."  *Id.* at 966.  *See also id.* at 968 (describing this duty as one "to provide reasonable network security").

exercise reasonable care for the safekeeping of the subject of the bailment and will be liable for any loss caused by the failure to do so.'" (quoting *LaPlace v. Briere*, 962 A.2d 1139, 1149 (N.J. Super. Ct. App. Div. 2009))); *cf. Holmes v. First Nat'l Bank*, 147 A. 441, 441 (N.J. 1929) (holding that where bank "held itself out generally, to its customers, as a safe depository" for the "securities of others," bank had "the duty of exercising reasonable care in such safe-keeping"). Therefore, the FAC pleads facts to support the existence of a relationship between the parties that gives rise to a duty of care.

In addition, the FAC sufficiently pleads an attendant risk of the "immediate and potential long-term loss that a user could incur in the event of an unjustified liquidation" of its collateral. FAC ¶ 39. The Moving Defendants argue that Celsius's harm was not foreseeable, Reply at 8; *id.* at 5-7, but Compound acknowledged this risk and represented that the Protocol was designed to counteract it. FAC ¶ 27 (alleging that Compound deemed "existing approaches" to storing assets vulnerable to such risks as "incorrectly closing out a position" and advertised the Protocol as a safer alternative); *see Lynch v. Scheininger*, 744 A.2d 113, 127 (N.J. 2000) ("The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care.").

The FAC also adequately pleads opportunity and ability to exercise control by alleging that Compound had "centralized control of the [P]rotocol" after creating it. FAC ¶ 42. Moreover, while Compound stated that it planned to transition that control to a "decentralized governance" structure by distributing COMP to its users, *id.*, the FAC alleges that Compound instead issued COMP primarily to itself and its insiders, thereby "continu[ing] to exercise effective control over" that structure and, thus, the Protocol, *id.* ¶ 51. Accordingly, the FAC alleges, Compound "exercised control over" the Protocol's operations "at all times relevant" to

24

its claims. *Id.* ¶ 52.  These factual allegations as to how Compound steered control of the Protocol to itself are more than a "conclusory assertion" made solely "upon information and belief" that Compound retained such control, Br. at 22, and therefore the Moving Defendants' citation to *Warren v. ResMed Corp.*, No. 21-cv-08531 (JKF), 2022 WL 2334055 (S.D.N.Y. June 28, 2022), is unpersuasive.  *See id.* at *3 ("A plaintiff cannot . . . 'merely plop "upon information and belief" in front of a conclusory allegation and thereby render it non-conclusory.'"  (citation omitted)).

Finally, because the FAC alleges a relationship between Celsius and Compound that is, in effect, a bailment, the pleadings support the imposition of a duty that already exists under New Jersey law, rather than seeking to "create[] a new common law duty" that may negatively impact the public interest.  *See Vertus*, 69 A.3d at 1261.  That is, because Compound allegedly controlled the platform onto which Celsius deposited its assets, with the understanding that the platform would hold those assets as collateral and ultimately return them to Celsius in the same or greater amount, Compound owed Celsius a duty of reasonable care with respect to the safekeeping of those assets.

In resisting the imposition of a duty, the Moving Defendants cite to various pieces of evidence that, they contend, factually rebut Celsius's pleaded allegations.  *See, e.g.*, Br. at 22 (arguing that Celsius pleads control-related facts only "upon information and belief," and that Compound's COMP supply schedule "rebuts" them).  But a motion to dismiss is not the time for the Moving Defendants to offer rebuttal evidence, even in the form of "public documents," Reply at 8.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that "a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact," and that, even in limited circumstances in which considering public documents is proper

on motion to dismiss, courts may not rely on them for the truth of their contents); *accord Turner v. Dellapia*, 498 F. Supp. 3d 500, 513 (S.D.N.Y. 2020).

Therefore, the FAC sufficiently pleads that Compound owed Celsius a duty of reasonable care with respect to the collateral Celsius posted on the Protocol.

### 2. *Breach of Duty*

"Breach of the duty of care occurs when the person's 'conduct falls below a standard recognized by law as essential to the protection of others from unreasonable risks of harm.'" *Gettis-Nyaanga v. Packer*, No. A-3359-22, 2024 WL 4369202, at *2 (N.J. Super. Ct. App. Div. Oct. 2, 2024) (alteration adopted) (quoting *Marshall v. Klebanov*, 875 A.2d 1035, 1039 (N.J. Super. Ct. App. Div. 2005)). "The question is 'whether a reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others' by their conduct." *Walker v. City of Irvington*, No. A-0642-23, 2024 WL 5243618, at *4 (N.J. Super. Ct. App. Div. Dec. 30, 2024) (alterations adopted) (quoting *Estate of Narleski v. Gomes*, 237 A.3d 933, 948 (N.J. 2020)).

Here, the FAC alleges that Compound breached its duty by "exposing its users to the volatility of one, and only one, source for" pricing data to set the value of its collateral for purposes of the Protocol's collateral ratio. FAC ¶ 64. It further alleges that this pricing data determined whether Protocol users' collateral was subject to immediate liquidation, *id.* ¶¶ 37-40; that Compound "failed to protect against any of the risks" arising from that single-sourcing, *id.* ¶ 64; and that these risks materialized in "the flash price spike" on Coinbase in November 2020, *id.* ¶ 95. Together, these allegations sufficiently plead an unreasonable risk taken by Compound with respect to holding Celsius's collateral and, thus, a breach of Compound's duty. *See, e.g., In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-md-02904, 2021 WL 5937742, at *15 (D.N.J. Dec. 16, 2021) (holding that defendants breached duty to safeguard

26

plaintiffs' personal information by, among other things, "failing to implement measures to monitor, audit, or evaluate" their "data security practices"); *In re Warner Music Grp. Data Breach*, No. 20-cv-07473 (PGG), 2025 WL 2531832, at *13 (S.D.N.Y. Sep. 3, 2025) (similar, and collecting cases).

In arguing that the FAC fails to plead breach, the Moving Defendants again point to public documents that, they say, disprove the FAC's allegations. Indeed, the Moving Defendants argue that Compound was not responsible for the decision to move to "single price sourcing," and that this single price sourcing was more reliable than alleged. Br. at 22-23; *see id.* at 8-10. As discussed, however, the Court does not review these documents for their truth on a motion to dismiss. *Roth*, 489 F.3d at 509. The Moving Defendants further contend that Celsius was "a sophisticated market participant" that should have, but "fail[ed] to[,] educate itself regarding" the Protocol's rules; they conclude that Celsius "cannot complain" of a breach by the Moving Defendants. Br. at 23. But this is also not a proper basis for dismissal. In New Jersey, "a plaintiff's own negligence does not bar recovery" unless it is "greater than the negligence of the defendant," *Buccilli v. Nat'l R.R. Passenger Corp.*, No. 08-4214, 2010 WL 624113, at *2 (D.N.J. Feb. 17, 2010), and the apportionment of negligence is not a task undertaken at the pleading stage, *see Bouchard v. CSX Transp., Inc.*, 196 F. App'x 65, 70 (3d Cir. 2006) ("Comparative negligence is ordinarily an issue for the jury[.]"); *cf. Alvarez v. United States*, No. 21-20205, 2025 WL 615125, at *8-9 (D.N.J. Feb. 26, 2025) (determining, after bench trial, that plaintiff's negligence barred recovery). Therefore, the FAC adequately pleads breach.

### 3. *Proximate Cause*

In New Jersey, a proximate cause is one "'which naturally and probably led to and might have been expected to produce the accident' which is the subject of the claim." *Yun v. Ford Motor Co.*, 647 A.2d 841, 850 (N.J. Super. Ct. App. Div. 1994) (Baime, J., dissenting) (quoting

27

*Scafidi v. Seiler*, 574 A.2d 398, 402 (N.J. 1990)), *rev'd for reasons articulated in dissent*, 669 A.2d 1378 (N.J. 1996).  "The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective realm of foreseeability."  *Id.* (citation modified).  Moreover, "a proximate cause need not be the sole cause of harm.  It suffices if it is a substantial contributing factor to the harm suffered."  *Resolution Tr. Corp. v. Fidelity & Deposit Co. of Md.*, 205 F.3d 615, 656 (3d Cir. 2000) (quoting *Perez v. Wyeth Lab'ys, Inc.*, 734 A.2d 1245, 1261 (1999)); *accord Hrymoc v. Ethicon, Inc.*, 249 A.2d 191, 217 (N.J. Super. Ct. App. Div. 2021).

The Moving Defendants do not dispute that Celsius suffered harm through the liquidation of its collateral, and they do not argue that the single-price sourcing was not the proximate cause of that harm; in fact, the Moving Defendants offer no argument on proximate cause.  The Court finds that it is sufficiently pleaded.  Here, the FAC alleges that (1) an erroneous drop in Celsius's collateral value could (and did) cause the immediate wrongful liquidation of Celsius's collateral, and that (2) Compound tied the value of Celsius's collateral assets to just one pricing source, such that any error in that source would directly impact Celsius's collateral ratio, rather than be measured against — and, in that way, buffered by — other pricing sources.  *See* FAC ¶¶ 57-58 (alleging the Coinbase price spike led to "the wrongful liquidation of valuable collateral," which would not have occurred if the Protocol had "relied on the 'top 10' exchanges, as the Defendants falsely represented, instead of its actual reliance on just a single input price oracle system").  These allegations are sufficient, at this stage, to plead that Compound's breach of duty was a substantial cause of Celsius's injury, and that this type of injury (wrongful liquidation) was "within an objective 'realm of foreseeability.'"  *Yun*, 574 A.2d at 402 (quoting *Bendar v. Rosen*, 588 A.2d 1264, 1269 (N.J. Super. Ct. App. Div. 1991); *see Dreeves v. Schoenberg*, 82 A. 530, 530 (N.J. 1912) (holding that landlord was proximate cause of water damage to premises where he failed to keep exterior door closed on cold night, and "as a result the pipes were frozen and

28

burst, causing the damage which forms the basis for this suit"). Therefore, the FAC adequately pleads proximate cause.

For all the foregoing reasons, the FAC adequately alleges negligence.

### D.    Negligent Misrepresentation

The FAC also asserts a claim against Compound for negligent misrepresentation. *See* FAC ¶¶ 67-75. A plaintiff pleading that claim must allege "an incorrect statement, negligently made and justifiably relied on, that may be the basis for recovery of damages for economic loss sustained as a consequence of that reliance.'" *National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 108 (3d Cir. 2012) (alterations adopted) (quoting *Singer v. Beach Trading Co.*, 876 A.2d 885, 890-91 (N.J. Super. Ct. App. Div. 2005). Moreover, "[i]n New Jersey (as in all other jurisdictions) any tort of negligence requires the plaintiff to prove that the putative tortfeasor breached a duty of care owed to plaintiff and that plaintiff suffered damages proximately caused by that breach." *Highlands Ins. Co. v. Hobbs Grp., LLC.*, 373 F.3d 347, 351 (3d Cir. 2004). "Material omissions, too, can support liability for negligent misrepresentation if a party has a duty to disclose." *Iola*, 700 F.3d at 108. And a duty to disclose "is not limited to special relationship situations," but rather may "arise in any situation called for by good faith and common decency," *Highlands Ins. Co.*, 373 F.3d at 355, including when "one party 'expressly reposes a trust and confidence in the other,'" *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 461 (D.N.J. 2002) (quoting *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998)).

Finally, negligent misrepresentation must be pleaded in accordance with the "heightened pleading requirements" of Rule 9(b) when it "sounds in fraud." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272-73 (3d Cir. 2006). "To satisfy that pleading standard, [p]laintiffs 'must identify the who, what, when, where, and how of the misconduct charged, as well as what

29

is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Serrano v. Campbell Soup Co.*, 773 F. Supp. 3d 127, 156 (D.N.J. 2025) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018)); *see also* Fed. R. Bankr. P. 7009 (applying Rule 9 to adversary proceedings).  That pleading standard does not apply, however, when the negligent misrepresentation claim is "expressly premised on negligence rather than fraud." *Suprema*, 438 F.3d at 272; *see also Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007, at *5 (D.N.J. Mar. 14, 2012) (declining to apply Rule 9(b) to negligent misrepresentation claim where it was "specifically alleged as a separate claim . . ., notwithstanding the significant overlap in allegations between" that claim and those sounding in fraud).

The FAC alleges that (1) Compound stated in the Whitepaper that the Protocol determined collateral values by "pool[ing] prices from the top 10 exchanges," FAC ¶ 41; (2) "[i]n fact, at all times relevant in" the FAC, Protocol's asset valuation tool was "tied solely to pricing data on Coinbase Pro," *id.* ¶ 40; (3) Celsius "relied on [the Whitepaper] statement in deploying assets on Compound," *id.* ¶ 74; (4) although the Whitepaper was "initially issued in February 2019," Compound continued to publish its "operative version . . . on its website," even to the present day, *id.* ¶ 32; and (5) Celsius was harmed by the wrongful liquidation of its collateral assets, which was caused by the Coinbase "price spike" and which would not have occurred if the Whitepaper statement had been true, *id.* ¶¶ 57-61, 75.  The Court finds that these allegations adequately plead negligent misrepresentation.

Having found that the FAC adequately pleads the existence of Compound's duty with respect to Celsius's collateral, the Court also finds the pleadings sufficient to establish Compound's duty to disclose — specifically, its duty to disclose facts that could affect Celsius's decision to continue to post its collateral on the Protocol.  *See Highlands Ins. Co.*, 373 F.3d at

30

355; *Maertin*, 241 F. Supp. 2d at 461. The FAC's allegation that Compound continued to publish the Whitepaper without correction, and that the Whitepaper contained misstatements concerning valuation both initially and on an ongoing basis, sufficiently pleads a breach of that duty. And for the same reasons the FAC adequately alleges proximate cause in its negligence claim, it adequately alleges proximate cause in its negligent misrepresentation claim. *See supra* Section II.C.3.

The FAC also sufficiently pleads Celsius's justifiable reliance on the Whitepaper's misrepresentation. To be sure, the FAC alleges that Celsius was a "[p]otential investor[]" when that misrepresentation "led [it] to believe ten sources of information would be used to value the collateral." FAC ¶ 4; *see also id.* ¶ 74 (alleging that Celsius "relied on [the misrepresentation] in deploying assets on Compound"). As discussed, Compound's duty to disclose the alleged falsity of this representation arose simultaneously with its duty of reasonable care with respect to Celsius's collateral — in other words, neither duty existed when Celsius was only a potential investor, and the FAC does not expressly allege that Celsius kept its collateral on the Protocol in *continued* reliance on the Whitepaper's misrepresentation. *See* Tr. 32:21-33:6 (Meghji's counsel conceding, "I am not sure there is a specific allegation that says continued reliance, but I think it's a reasonable inference from the facts that are alleged in the [original] complaint"). However, as pointed out during oral argument, given that Celsius alleged its reliance on the Whitepaper in initially deploying its assets on the Protocol, it is reasonable to infer Celsius's continued reliance on the Whitepaper in maintaining its assets on the Protocol, where it believed those assets to be safer from risk than they were. *See* FAC ¶ 64 (alleging that Compound "expos[ed] its users to the volatility of one, and only one, source for" pricing data, and that Compound "failed to protect against any of the risks" arising from that single-sourcing); *see also Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (explaining that, on a motion to dismiss,

courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant" (quoting *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994))). This inference is especially reasonable given the FAC's allegation that Compound continued to post the Whitepaper on its website at all relevant times. *See* FAC ¶ 32.[9]

The Moving Defendants' arguments with respect to negligent misrepresentation rely primarily on their arguments with respect to negligence — that is, that Compound owed no duty to Celsius and did not breach any such duty. *See* Br. at 25; Reply at 9-10. These arguments fail here for the same reasons. The Moving Defendants additionally argue that the FAC fails to "articulate any facts suggesting that" the Whitepaper statements were false at the time the Whitepaper was initially posted. Reply at 10. Even assuming that Celsius's negligent misrepresentation claim requires Meghji to plead with particularity under Rule 9(b) — which the Court does not hold here, *see Suprema*, 438 F.3d at 272; *Donachy*, 2012 WL 869007, at *5 — the FAC's allegations clear that standard's higher bar. The FAC alleges who made the misrepresentation (Compound), what the misrepresentation was (the Protocol's pricing system was tied to ten sources), when it was made (February 2019, and for as long as the Whitepaper remained on Compound's website), where it was made (in the Whitepaper, published by Compound) and why it was false (because, "at all times relevant in this Complaint," Compound's pricing system "was tied solely to pricing data on Coinbase Pro, as opposed to a combination or average of multiple exchanges or sources"). FAC ¶ 40. That is enough. *See Serrano*, 773 F. Supp. 3d at 156.

---

[9] The Moving Defendants, in arguments concerning Celsius's Rule 10b-5 claim, contend that Celsius did not justifiably rely on the Whitepaper given certain public statements by Compound or the Individual Defendants that override the Whitepaper. Br. at 31-33; *see also id.* at 10 n.16. Again, the Court does not rely on these documents for their truth on a motion to dismiss.

Therefore, the FAC adequately pleads negligent misrepresentation.

### E.    Professional Malpractice

Celsius's final common-law claim against Compound is for professional malpractice. *See* FAC ¶¶ 76-85.  In connection with this claim, the FAC asserts that Compound is a "professional[] in the financial technology industry" that breached an industry-wide "standard of care" by failing to "maintain Compound in a commercially reasonable manner" and "fixing . . . Compound's oracle's price data to only one source."  *Id.* ¶ 77-78, 81.  The Moving Defendants argue that, under New Jersey law, professional malpractice is "a statutory claim limited to certain categories of licensed professionals" that do not include Compound, and that Meghji has failed to establish an applicable professional standard of care, Br. 23-25; Reply at 9. The Court agrees with the Moving Defendants' first argument, to which Meghji does not respond, and finds on that basis that Meghji has failed to state a professional malpractice claim.

In New Jersey, "[a] professional malpractice action arises when there is a claim for property damages resulting from an alleged act of malpractice or negligence *by a licensed person* in his profession."  *Sobilo v. Riskin*, No. A-2372-13T2, 2015 WL 2401160, at *2 (N.J. Super. Ct. App. Div. May 21, 2015) (emphasis added); *see also Saltiel v. GSI Consultants*, 788 A.2d 268, 280-81 (N.J. 2002) (citing cases permitting professional malpractice claims against physicians, attorneys, and insurance brokers).  The FAC does not allege Compound to be such a licensed professional, and Meghji offers no authority indicating that professional malpractice liability extends to Compound as a member of the financial technology industry.  The mere fact that a defendant works in a profession does not automatically render that defendant liable to theories of professional malpractice.  *See Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 479 F. Supp. 738, 740 n.1 (D.N.J. 1979) (explaining that "[s]imply because an activity is technically complex and important to the business community does not mean that greater potential liability must attach,"

and therefore declining to extend "established theories of professional malpractice" to "those who render computer sales and service"), *aff'd in part, remanded in part on other grounds*, 635 F.2d 1081 (3d Cir. 1980); *cf. Hosp. Comp. Sys., Inc. v. Staten Island Hosp.*, 788 F. Supp. 1351, 1361 (D.N.J. 1992) (applying New York law, and explaining that "[p]rofessionals may be sued for malpractice because the higher standards of care imposed upon them by their profession and by state licensing requirements engenders trust in them by clients that is not the norm of the marketplace.  When no such higher code of ethics binds a person, such trust is unwarranted."); *Veriton Partners Master Fund, Ltd. v. Cornell*, Civil Action No. 19-377, 2020 WL 2917258, at *4 (D. Del. June 3, 2020) (dismissing professional malpractice claim against expert witness, and explaining that Delaware law "recognize[s] professional negligence causes of action" against professionals that "require a license to practice").

Therefore, the FAC does not sufficiently plead professional malpractice.

### CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Moving Defendants' motion to dismiss, as follows:

1. Count I (negligence) is dismissed as to the Compound DAO;

2. Count II (negligent misrepresentation) is dismissed as to the Individual Defendants;

3. Count III (professional malpractice) is dismissed in its entirety;

4. Count IV (Rule 10b-5 violation) is dismissed in its entirety; and

5. Count V (breach of fiduciary duty) is dismissed in its entirety.

The motion to dismiss is otherwise DENIED.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 23 and 32, and to dismiss Defendants Compound DAO, Robert Leshner, and Geoffrey Hayes from the case.

Dated: March 4, 2026
New York, New York

SO ORDERED.

_Jennifer Rochon_
JENNIFER L. ROCHON
United States District Judge